RECORD NOS. 13-4331(L); 13-4467

In The

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## VINCENT A. WILLIAMS, a/k/a V; TORRY VON ZENON,

*Defendants – Appellants*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT RICHMOND

———————

## BRIEF OF APPELLANTS

———————

John F. McGarvey
JOHN F. McGARVEY, ATTORNEY AT LAW
10132 West Broad Street
Glen Allen, Virginia 23060
(804) 270-4444

Steven P. Hanna
ATTORNEY AT LAW
The 21 Professional Center
2025 East Main Street, Suite 116
Richmond, Virginia 23223
(804) 643-3979

*Counsel for Appellant Williams*

*Counsel for Appellant Zenon*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF APPELLATE JURISDICTION (Appellant Williams)...............1

STATEMENT OF APPELLATE JURISDICTION (Appellant Zenon) ...................1

STATEMENT OF THE ISSUE (Appellant Williams) ...........................................1

STATEMENT OF THE ISSUE (Appellant Zenon) .................................................1

STATEMENT OF THE CASE (Appellant Williams) ...........................................2

STATEMENT OF THE CASE (Appellant Zenon) ...................................................3

STATEMENT OF THE FACTS (Appellant Williams) ...........................................4

STATEMENT OF THE FACTS (Appellant Zenon) .................................................5

SUMMMARY OF THE ARGUMENTS (Appellant Williams) ...........................20

SUMMARY OF ARGUMENTS (Appellant Zenon) ...........................................20

ARGUMENT (Appellant Williams) ...................................................................21

    I.    Appellant's conviction for violating 21 U.S.C. Section 846 must be reversed because the Government did not meet its burden of proving, beyond a reasonable doubt, that Appellant conspired or attempted to possess with intent to distribute five kilograms or more of cocaine ............................................................21

        A.    Standard of Review .................................................................21

        B.    Discussion ................................................................................22

ARGUMENT (Appellant Zenon) ..........................................................................24

    A.    Standard of Review ..............................................................24

    B.    Argument ...............................................................................25

           1.    Conspiracy and Overt Acts ......................................25

           2.    Mere Presence .........................................................27

CONCLUSION (Appellant Williams) ................................................................30

CONCLUSION (Appellant Zenon) ....................................................................30

REQUEST FOR ORAL ARGUMENT .................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Jackson v. Virginia*,
    443 U.S. 307 (1979)..................................................................20, 21, 24, 25

*United States v. Brooks*,
    957 F.2d 1138 (4th Cir. 1992) ....................................................25

*United States v. Burgos*,
    94 F.3d 849 (4th Cir. 1996) ........................................................27

*United States v. Green*,
    599 F.3d 360 (4th Cir. 2010) ................................................24, 25

*United States v. Madrigal-Valdez*,
    561 F.3d 370 (4th Cir. 2009) ......................................................25

*United States v. Ryan -Webster*,
    353 F.3d 353 (4th Cir. 2003) ......................................................24

*United States v. Saadeh*,
    61 F3d 510 (7th Cir. 1995) .........................................................27

*United States v. Smith*,
    451 F.3d 209 (4th Cir. 2006) ......................................................21

*United States v. Wilson*,
    135 F.3d 291 (4th Cir. 1998) ......................................................25

## CONSTITUTIONAL PROVISION

U.S. CONST. amend. VI...........................................................................24

## <u>STATUTES</u>

18 U.S.C. § 3231 ...........................................................................1

18 U.S.C. § 3742(a) .....................................................................1

21 U.S.C. § 841 ...........................................................................22

21 U.S.C. § 841(a)(1) ...............................................................3, 23

21 U.S.C. § 841(b)(1)(A) ...........................................................3

21 U.S.C. § 846 ....................................................................*passim*

21 U.S.C. § 847 ...........................................................................2

28 U.S.C. § 1291 ........................................................................1

## <u>RULE</u>

Fed. R. Crim. P. 29..............................................................20, 24

## STATEMENT OF APPELLATE JURISDICTION
### (Appellant Williams)

The District Court's subject matter jurisdiction derived from 18 U.S.C. § 3231.  The judgment entered against Appellant in this case is a final judgment that disposes of all claims against Appellant.  This Court's jurisdiction to review the Judgment derives from 28 U.S.C. § 1291.  Judgment was entered on May 29, 2013 and the Notice of Appeal of Final Judgment was timely filed on May 29, 2013.

## STATEMENT OF APPELLATE JURISDICTION
### (Appellant Zenon)

The district court has jurisdiction over this matter pursuant to 18 U.S.C. § 3231.  The notice of appeal was filed pursuant to 18 U.S.C. § 3742(a).  This court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE
### (Appellant Williams)

I.      Was the evidence at trial insufficient, as a matter of law to show that Appellant conspired to possess with intent to distribute cocaine or attempted to possess with intent to distribute cocaine.

## STATEMENT OF THE ISSUE
### (Appellant Zenon)

I.      Whether the district court errred in denying the defendant's Motion for Judgment of Acquittal on the grounds that the evidence was

1

insufficient as a matter of law to convict the defendant of the conspiracy or the attempt to possess with the intent to distribute cocaine given the facts that the defendant was not part of the conspiracy, did not commit an overt act, and was merely present when the incriminating evidence was found.

## STATEMENT OF THE CASE
### (Appellant Williams)

On November 13, 2013, a grand jury returned a First Superseding Bill of Indictment (J.A. 21.)  In Count One, Appellant was charged with knowingly and intentionally conspiring to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 847. (J.A. 21.)  In Count Two, Appellant was charged with knowingly and intentionally attempting to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 (J.A. 27.)   Appellant was convicted on both counts on January 24, 2013.

A Presentence Investigation Report ("PSR") was filed on March 22, 2013, and an Addendum was filed on April 9, 2013. (J.A. 529).  The PSR calculated the Appellant's criminal history as category I and his offense level at 38. (J.A. 550.)  Thus, the guideline range was 235-293 months.  On April 26, 2013, Appellant was sentenced to 250 months on each count to be run concurrently.  He was also sentenced to a term of 5 years supervised probation on each count to be run concurrently.

## STATEMENT OF THE CASE
### (Appellant Zenon)

The defendant was indicted on two felony counts on the First Superseding Indictment. Count One alleged that between January 2012, and continuing through March 8, 2012, On January 23, 2010, he conspired with the other named defendants to possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(A). Count Two alleged that between January 2012, and continuing through January 27, 2012, that the defendant, along with other named defendants, aided and abetted by one another and others, did knowingly, intentionally and unlawfully attempt to possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of Title 18, United States Code, Section, 841(a)(1) and (b)(1)(A).

The defendant and codefendant, Vincent A. Williams, plead not guilty to the charges. They were tried together before a jury, the Honorable Henry E. Hudson presiding. Trial by jury commenced on January 22, 2013 and was concluded on January 24, 2013. The defendant was found guilty of the two charges.

On June 17, 2013, the defendant was sentenced to a term of imprisonment of Three-Hundred Eighty-Four (384) months on each of Counts 1 and 2, to be served concurrently.

### STATEMENT OF THE FACTS
### (Appellant Williams)

The government alleges that Vincent A. Williams was involved in a drug conspiracy beginning at some point prior to January, 2012 and continuing through on or about March 8, 2012 in the Eastern District of Virginia and elsewhere (J.A. 21.)  An incident occurred on January 27, 2012 which led to Williams' arrest on November 28, 2012. (J.A. 533.)  The government built a case against the appellant using historical evidence supported by government witnesses (J.A. Transcript pp 33-456.)

On January 27, 2012 a search warrant was executed at the apartment of Torry Von Zenon in Owings Mill, Maryland. (J.A. 354.)  Agent Alznauer testified that the investigation began as a result of being contacted by the Riverside, California DEA Office.  The Riverside office indicated that they had a confidential source who was approached by Hiram and Virginia Alvarez.  The Alvarez's were going to broker a deal for 100 kilograms of cocaine that was going to take place in Richmond, Virginia. (J.A. 341.)  Hiram and Virginia Alvarez wanted to find an individual in the Richmond, Virginia area who wanted to buy 100 kilograms of cocaine (J.A. 41.)  Most of this information came from a confidential informant

4

named Jose Urias who had worked with the DEA since 2003. (J.A. 75.) He found out that the Alvarez's had found a buyer for the cocaine in the Virginia, Maryland, or D.C. area named "Squirrel", or "Scroll" who the DEA subsequently learned was Dion Williams, the step father of the appellant. (J.A. 43.) Urias was to fly to the Richmond, Virginia airport and meet with Dion Williams. (J.A. 44.) Another individual, Pedro Santana, accompanied Urias as the representative of the Alvarez's. (J.A. 44.) They learned that the deal was to take place in Owings Mill, Maryland and not Richmond, Virginia at an apartment at 4658 Riverside Drive, Apartment 201in the Riverside apartment complex. (J.A. 25.) At that apartment complex, approximately $1,500,000.00 was counted out for the transaction. A search warrant was obtained and the apartment was searched on the afternoon of January 27, 2012. Approximately $1,500,000.00, two handguns, cellphones, two Royal Sovereign money counters were recovered as a result of the search (J.A. 26.) No cocaine or paraphernalia was discovered nor was there any evidence that the word cocaine, was discussed in the presence of the appellant. (J.A. 33-456.)

## STATEMENT OF THE FACTS
### (Appellant Zenon)

On January 22, 2013, trial by jury commenced on the counts in the First Superseding Indictment against the defendant, Torry V. Zenon, and the codefendant, Vincent A. Williams, the Honorable Henry E. Hudson presiding. (J.A. 34-35). The government first called Christopher Follis. He was a special

agent with the Drug Enforcement Administration (DEA) in Riverside, California. (J.A. 37). He identified pictures of Hiram Alvarez and Virginia Alvarez. (J.A. 38-39). He stated that since December 2010 the DEA had a drug investigation going on in Riverside concerning both Alvarezes. (J.A. 39-40). He stated they used a confidential source identified as Jose. (J.A. 40). Jose was connected to the Alvarezes. (J.A. 41). Jose approached the DEA around 2011 or early January 2012 and said that he had known the Alvarezes for a long time. (J.A. 41). Jose told the DEA that the Alvarezes wanted to find a seller for an individual in the Richmond, Virginia area who wanted to buy 100 kilograms of cocaine. (J.A. 41). Jose gave the nickname of Squirrel or Scroll in the Virginia area. (J.A. 41). Jose passed along a contact phone number that he was dealing with Alvarez. (J.A. 42). Jose, while working for the DEA, posed as a seller of drugs. (J.A. 42). Later on Follis learned that Dion Williams was Scroll or Squirrel. (J.A. 43). Jose was to fly from California to Richmond, Virginia to meet with Scroll or Squirrel for the purposes of meeting one another and counting money. (J.A. 3-44). Follis identified Pedro Santana as being involved with and working for the Alvarezes. (J.A. 44). It came to Follis' attention that Santana, Jose, and another informant were going to fly to Richmond. (J.A. 45). Follis then contacted DEA agent Jason Alznauer in Richmond and gave him the information. (J.A. 45). Follis learned

that while the named individuals were flying to Richmond, the deal itself was going to take place in Maryland. (J.A. 45-46).

On cross-examination Agent Follis stated that he never saw Torry Zenon at any time nor had he ever heard of him during the investigation. (J.A. 47).

The government then called Hiram Alvarez. (J.A. 48). He had plead guilty to drug conspiracy in federal court. (J.A. 48). His wife, Virginia Alvarez, was in negotiations with someone named Scroll to send cocaine to him in Maryland. (J.A. 49). He knew Jose as being Jose Burgueno and saw him on a regular basis in 2011 because they all lived together for a few months. (J.A. 50-51). Scroll told Virginia, who in turn told Hiram, that he had $800,000.00 to invest. (J.A. 51). Through 2011 the offer from Scroll got bigger to $2.2 million for 100 kilograms of cocaine. (J.A. 52). Alvarez was hoping to get between $700 to $800 per kilo. (J.A. 53). Alvarez sent Pedro Santana in his place to Richmond. (J.A. 55).

On cross-examination Alvarez stated that he did not know Torry Zenon. (J.A. 61).

The government next called Jose Burgueno Urias. (J.A. 74). He works as a paid confidential source for the DEA. (J.A. 75-76). Jose identified Bernice as being married to Hiram Alvarez. (J.A. 78).[1] He stated that during 2011 the Alvarezes lived with him during which they had conversations about drug

---

[1] The names Bernice and Virginia were used interchangeably and are presumably the same person.

trafficking. (J.A. 79-80). He learned the name of Scroll in the Virginia, Maryland, D.C. areas as a client. (J.A. 80). In working with the Alvarezes he agreed to sell 100 kilos of cocaine to Scroll. (J.A. 81-82). The agreed upon price was $26,500.00 per kilo for a total purchase price of $2,650,000.00. (J.A. 82). Jose agreed to travel to Richmond with his son-in-law and Pedro Santana to see the money. (J.A. 82-83). Pedro had the telephone numbers for Scroll and would communicate between Scroll, Jose, and Hiram. (J.A. 83). Jose, his son-in-law, and Pedro met up in Atlanta in a layover and then flew to Richmond together. (J.A. 87). When the arrived in Richmond they rented a car and drove to a hotel address provided by Hiram. (J.A. 87). They arrived at the hotel at about 2:00 a.m. (J.A. 88). Later that morning Jose met with a DEA agent who gave him recording devices. (J.A. 88). Afterwards Jose and Pedro met Scroll at the hotel in Virginia. (J.A. 89). They all left and went to an apartment near the hotel. (J.A. 89). After entering the apartment Scroll barred the front door. (J.A. 90). In the apartment Pedro translated and Scroll and Jose discussed needs, amounts, and prices for drug purchases. (J.A. 94). Scroll retrieved backpacks full of money in the amount of $350,000, not the $2,650,000 as discussed earlier. (J.A. 94). Scroll wanted Jose to start counting the money but Jose refused because it was not the agreed upon amount. (J.A. 94-95). Jose examined some of the money to see if it was real. (J.A. 95). Scroll said there had been a miscommunication with the Alvarezes

8

about the deal and he would get all the money at which time Jose would come back and count it.  The meeting then ended.  (J.A. 95).  Later that day Jose met with the DEA and gave them the recording of that meeting.  (J.A. 96).  Later that day Scroll brought food to the hotel for everyone and they discussed the deal and the fact that Scroll would get all of the money together.  (J.A. 96).  They negotiated the price and Jose agreed to cut the price by $500 to $26,000 per kilo.  (J.A. 96-97).  Later that evening everyone went to the same apartment as in the morning.  (J.A. 97).  Jose identified the codefendant, Mr. Williams, as the person being in the apartment the first time and the son of Scroll.  (J.A. 98).  Scroll and Williams took several boxes from the garage to the apartment and blocked all the entryways.  The boxes were full of money.  (J.A. 98-99).  The money was wrapped in black tape.  (J.A. 99).  It was the same or similar the money he had seen in the morning.  (J.A. 99).  The money was separated into piles of $20 and $100 bills and began counting them.  (J.A. 99).  Scroll and Williams had money counting machines and were using them to count the money.  (J.A. 99).  Williams knew how to operate the machine and they set both machines up to count to $5,000.  (J.A. 99).  It took about two to two and one-half hours to count the money.  (J.A. 100).  Later a woman arrived with a box which had $200,000 in it.  (J.A. 100-101).  During the process Jose and Scroll talked about the deal in which Jose referred to the cocaine as 'squares'.  (J.A. 102).  Scroll stated that his son, Williams, did not like to study and

9

in the future he and his son would be in charge of receiving the merchandise. (J.A. 103). They also discussed the security of the deal during which Scroll said it was safe and there were people around guarding, making sure no police came, and that everything was fine. (J.A. 104).

While in the apartment he saw Scroll use three cell phone but did not see any weapons. (J.A. 106). He also saw Williams with two cell phones near him. (J.A. 106). At the end of the meeting they had counted $1,534,000. (J.A. 106). Scroll said he they waited two or more hours he would get the other $400,000. (J.A. 107). Jose said the merchandise was about two hours away. (J.A. 107-108). Afterwards Jose went to a nearby restaurant and provided the DEA with his recording device. (J.A. 108). Jose told Pedro to call Scroll and set up a meeting for tomorrow. (J.A. 109-110). As time went by Scroll did not answer. (J.A. 110). The next morning Pedro was still unsuccessful getting in touch with Scroll. (J.A. 110). Jose knew that the police had entered the apartment the previous night but pretended to Pedro that the deal was still going forward. (J.A. 110-111).

On cross-examination Jose stated he did not bring any drugs to Virginia. (J.A. 123). He stated that he did not see any drugs or guns in the apartment. (J.A. 123). He did not see anyone walking around the apartment complex while he was there and never saw the defendant, Zenon, in the apartment. (J.A. 127-128).

The government called Michael Tooley, Special Agent for the DEA, who was based in Richmond. (J.A. 146). He was the translator between the other agents and the confidential sources. (J.A. 147). On the evening of January 26, 2012, he was preparing for the informants to fly in from California to Richmond. (J.A. 148). He and other agents follow the confidential sources' car to Owings Mills, Maryland. (J.A. 149-150). The next morning at 7:30 the agents met with the sources at a Burger King near the hotel where the CS's were staying. (J.A. 149-150). The sources were provided with listening devices. (J.A. 150). The agent, who was a passenger in Agent Alznauer's vehicle, followed the CS's who followed Scroll to an apartment complex. (J.A. 150-151). The cars entered the complex through the gate which opens to the left and right. (J.A. 153). Agent Alznauer parked in front of the rental office. (J.A. 153). The CS's went to the right. (J.A. 153). The agent observed a male at the corner of the apartment complex walking away from Number 201 of the apartment. (J.A. 158). The male was wearing a black coat, a stocking cap, had a very oval face, and appeared to be about 6'1", 280 pounds. (J.A. 158-159). The male was in the middle of the road and seemed to be looking around. (J.A. 159). The agent saw this around 10:00 a.m. and they were in their position for five or ten minutes. (J.A. 159). During the first meeting the CS's were in the apartment for about thirty minutes. (J.A. 159). The CS's were in a gray or silver Chevrolet Malibu backed out of a garage and left

11

the area.  (J.A. 160).  The agent later met with the CS's and obtaining the recording devices.  (J.A. 161).  The agent provided another listening device to the CS's for the next meeting which was to take place.  (J.A. 165).  During the second meeting the agent was parked in the complex.  (J.A. 166).  The second meeting lasted for two to three and one-half hours.  (J.A. 168).  After the second meeting the agent met up with the CS's again and retrieved the recording devices.  (J.A. 168).

On cross-examination the agent stated that he lost sight of the CS's car in the apartment complex.  (J.A. 174).  He stated that the male he observed was not seen in the first encounter but in the second one.  (J.A. 178).  The suspect male did not enter into apartment 201 nor was he seen with a cell phone at the scene.  (J.A. 179).  The individual was seen heading away from apartment 201.  (J.A. 180).  This was the last witness called this day.

The trial resumed the next day, January 23, 2013.  The government called Blaine Davis who was previously with the DEA on January 26, 2012.  (J.A. 198-199).  He was part of the investigation in this matter.  (J.A. 199).  He saw Pedro Santana and the CS's arrive at the Richmond Airport on January 26, 2012.  (J.A. 199).  The agent equipped the rental car, a gray Malibu, with audio and video recording devices in the interior and a GPS system tracker.  (J.A. 200).  He followed the Malibu up to the Maryland area.  (J.A. 200).  The next morning he followed the CS's to the apartment complex on two occasions.  (J.A. 201).  He set

up a surveillance position at the complex. (J.A. 201-202). He later saw a garage door opening, the Malibu backing out and exiting the complex. (J.A. 202). The agent did not know what apartment was associated with the particular garage. (J.A. 203). The agent's goal in his surveillance was to identify anyone and any vehicle associated with the CS's mission and anyone associated with the garage to visually identify and note who came and who went. (J.A. 204).

During the second meeting, the agent was located in an area where he could view the garage door with a direct line of sight. (J.A. 204-205). The agent was using 10 power binoculars. (J.A. 205). Prior to the arrival of the CS's in their Malibu, the agent saw a green Ford F-150 with Maryland tags pull up in front of the garage door. (J.A. 205). The door opened, the vehicle went in, and the door remained open with the garage interior well lit. (J.A. 205). A black man exited the truck wearing a reflective construction vest and a white hard hat. (J.A. 206). He was also wearing a black jacket underneath the vest and dark colored pants, like he was coming from work. (J.A. 206). This man retrieved a plastic bag from the vehicle, walked to the front of the garage, came back a short time later, got back in the vehicle, and backed straight up into the parking stall directly behind the garage door. (J.A. 206). The agent identified the defendant, Zenon, as the person he saw. (J.A. 207). The agent then stayed at this location for a couple of hours. (J.A. 207). The truck was parked next to another Ford pickup truck. (J.A. 208).

13

The agent then left to prepare the search warrant. (J.A. 208). Upon return he was part of the tactical team which executed the search warrant on apartment 201. (J.A. 208-210). The agent observed numerous items in the apartment including an Oklahoma driver's license with Mr. Zenon's name on it. (J.A. 211). Two firearms, a calculator, and two money counters were recovered from the apartment. (J.A. 211). Ford keys which fit the two Ford vehicles were recovered, a white hat and yellow reflective vest was recovered. (J.A. 211). The white hat and vest appeared to be the same items seen earlier by the man in the garage. (J.A. 212). Fifteen cells phones were seized along with various backpacks and a white plastic bag. (J.A. 213). There was also a cardboard box with black duct tape, stacks of currency, and wrappers. (J.A. 213). Three wallets were seized in the apartment. (J.A. 226).

On cross-examination the agent stated that in the front bedroom where Mr. Zenon's wallet was found he did not find a firearm or any money. (J.A. 237-238). The boxes of money were found in the back bedroom away from Mr. Zenon's bedroom. (J.A. 238). The agent did not recall that any of the documents found belonging to Mr. Zenon were found in the back bedroom where the Glock firearm and wrappers were located. (J.A. 240).

The agent stated that he saw Mr. Zenon drive up around 6:30 p.m. (J.A. 242). The agent stated that although he saw the defendant put a black bag in the

garage, he did not find a black bag with money in the apartment. (J.A. 242). The agent admitted that he saw the defendant with the bag, go out, park the vehicle, and walk back into the garage. (J.A. 242-243). The agent did not see any contraband in either vehicle. (J.A. 245).

The government called Officer Chris Helphenstine of the Baltimore County Police Department. (J.A. 274). He was a member of the S.W.A.T. that entered the apartment. (J.A. 275). He saw the defendant in the laundry area along the door frame. (J.A. 277).

On cross-examination the officer stated that the defendant came out of the laundry area voluntarily. (J.A. 278). The officer did not find any weapons or money in the laundry area. (J.A. 280).

The government called George Vigue. He was a detective with the Baltimore City Police Department. (J.A. 282). He assisted the DEA during this investigation. (J.A. 282-283). He set up his location at the apartment complex and began doing surveillance in the morning. (J.A. 286). He saw the CS's vehicle exit the garage. (J.A. 286). While conducting surveillance he heard information over the radio about a particular person that was of interest. (J.A. 287). He saw a black male wearing a black coat and a black knit cap talking on a cell phone at the end of the building. (J.A. 287-288). The man then walked around the building out of

view. (J.A. 289). The detective shared this information with his colleagues. (J.A. 289).

The detective left and later returned as part of the team which searched the apartment. (J.A. 292). The detective seized the money, took it to the bank the next day, and was present when it was counted. (J.A. 293). It took four hours to count and totaled $1,149,377.00. (J.A. 293-294).

The government called Paul Swartz. He was working for the Newport News Police Department from 1982 to 2008 at which time he retired as a sergeant in charge of the intelligence unit. (J.A. 320-321). He was contracted to assist with this investigation. (J.A. 321). He reviewed the forensic report on the cell phones and data provided by Agent Roffman. (J.A. 321). His analysis focused on four of the fifteen phones which were seized. (J.A. 291). He then created a spreadsheet of the text messages that were obtained off the four phones. (J.A. 323-324). He included names associated with the phones. (J.A. 324-325). He stated all four phone are Verizon Wireless prepaid, commonly referred to as "phone in a box". (J.A. 327). No identifying information is needed to purchase and activate this type of phone. (J.A. 327). The phones were used primarily for texting. (J.A. 327). One of the phones was listed as 'Yo' and another one was listed as 'Yo Yo'. (J.A. 298).

On January 12, 2012 at 5:14 p.m., a text message from Exhibit 66 to Exhibit 68 read "Got it."  (J.A. 331).  It was the first text message sent from that phone. (J.A. 332).

The government called Jason Alznauer who was an agent with the DEA since 1999.  (J.A. 340).  He was a naval intelligence officer for four years prior to joining the DEA.  (J.A. 341).  He was involved in the investigation of this case after having been contacted by the DEA in California.  (J.A. 341).  The target of the operation in Maryland was Dion Williams also known as Squirrel or Scroll. (J.A. 344).  He followed the CS's car to the apartment complex in the morning. (J.A. 345).  He was not able to follow the CS's car into the complex as it was a gated community and he did not have access.  (J.A. 345).  He along with Agent Tooley parked their car in front of the manager's office.  (J.A. 346).  He is sitting in his vehicle monitoring the transmissions.  (J.A. 346).  He saw a man, wearing a black knit skull cap and black puffy jacket, standing and looking through the gate. (J.A. 347).  He was able to see his face.  (J.A. 347).  He identified Mr. Zenon as the man at the gate.  (J.A. 347-348).  The man at the gate was looking around and started looking at him and Agent Tooley so he looked away.  (J.A. 348).  The man at the gate was again staring at the agents.  (J.A. 348).  The agent told his partner that he thought the man was conducting counter surveillance and they needed to

17

move.  (J.A. 350).  They moved to an apartment complex next to the target complex.  (J.A. 350).

The agent then conducted investigation as to the three people arrested inside the apartment and their employment status.  (J.A. 362).  He obtained wage records from the state of Maryland as to the people arrested.  (J.A. 363).  Neither Vincent nor Dion Williams had any income as reflected by the state of Maryland.  (J.A. 363).  Maryland confirmed that Mr. Zenon did have income in 2012.  (J.A. 364).  Also, the state of Oklahoma confirmed that Mr. Zenon had income in 2012.  (J.A. 364).  Mr. Zenon had a federal tax return for 2010 for an income of $17,611.00.  (J.A. 366).  The agent obtained the lease for apartment 201 with Mr. Zenon as the tenant with a monthly rent of $1,460.00.  (J.A. 368-369).  The term of the lease began June 21, 2011.  (J.A. 369).  The agent reviewed the wallets recovered, one of which had a commercial diver's license in the name of Torry Von Zenon.  (J.A. 371).  A series of credit cards were found in the name of Mr. Zenon.  (J.A. 371).  There is a total of eleven credit and debit cards found in the same wallet.  (J.A. 371).  In the same wallet is a receipt from Neiman Marcus on December 24, 2011 for $2,864.65 from a cash payment of $2,900.65.  (J.A. 372).

The agent stated that he had specific training and schooling on drug investigations and counter surveillance.  (J.A. 383-389).  He stated that it was significant that one text message read 'Got it' the day after Mr. Zenon arrived in

Baltimore from Phoenix. (J.A. 399). He stated that a text message was sent on January 27, 2012 which read, "At about 8 am roll across the hall and see what it looks like.post til I get there." (J.A. 399). Dion Williams and the CS's were going to meet at 9:00 a.m. (J.A. 399). The agent stated that "Post" is a term, even a military term, to stand post, like standing watch. (J.A. 399- 400). At 9:52 a.m., one phone sent to another a text, "Want me to come out." (J.A. 400). A reply within 30 seconds read, "No.". (J.A. 400). These texts corresponded to the times the CS's arrived at the complex. (J.A. 400).

The agent testified as to the importance of counter surveillance for a drug dealer. (J.A. 401). He stated they use counter surveillance so they won't get robbed or arrested. (J.A. 401).

On cross-examination the agent verified that Mr. Zenon was employed by Wellco Tank Truck, Inc. in 2012 (J.A. 405). The agent did not see Mr. Zenon on a cell phone at the complex. (J.A. 412). The agent did not see him with any weapon and only saw him for between 10 to 30 seconds. (J.A. 412). During this investigation the agent had never heard of Mr. Zenon prior to his arrest. (J.A. 413). The agent examined the two subject vehicles and did not find any contraband or anything of significance. (J.A. 415). The agent stated that the name 'Torry Zenon' is not in any of the four cell phones. (J.A. 416). The agent

confirmed that Dion Williams, also known as Squirrel or Scroll was one of the targets of the investigation.  (J.A. 417).

At the conclusion of Agent Alznauer's testimony the government rested. The defense for Mr. Zenon made a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  (J.A. 425-431).  The court denied the motion and the matter was ultimately presented to the jury for deliberation.

## SUMMMARY OF THE ARGUMENTS
### (Appellant Williams)

The evidence against Appellant was legally insufficient to establish guilt beyond a reasonable doubt under the *Jackson v. Virginia*, 443 U.S. 307 (1979), on the 21 U.S.C. § 846 counts, conspiracy or attempt to possess with intent to distribute five kilograms or more of **cocaine.**

## SUMMARY OF ARGUMENTS
### (Appellant Zenon)

The court erred in denying the defendant's motion for a judgment of acquittal.  The defendant was never the target of this investigation.  No confidential informant or other individual from California ever had any contact with the defendant.  The defendant was merely present in the apartment when it was raided and its occupants and contents seized.  There was no evidence that he committed any overt act in any form as part of this conspiracy.  Expert testimony was not

provided that his actions of looking around and looking at the agents was consistent with the method of counter surveillance.  The defendant was gainfully employed.  Finally, no evidence was producing connecting the defendant to one of the cell phones with the described text messages.

## <u>ARGUMENT</u>
## <u>(Appellant Williams)</u>

**I.    Appellant's conviction for violating 21 U.S.C. Section 846 must be reversed because the Government did not meet its burden of proving, beyond a reasonable doubt, that Appellant conspired or attempted to possess with intent to distribute five kilograms or more of cocaine.**

### A.    Standard of Review

An appellate court reviews the denial of a motion for a judgment of acquittal *de novo. United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006).

In analyzing the sufficiency of the evidence, an appellate court must determine whether the record evidence could support a finding of guilt beyond a reasonable doubt in a light most favorable to the plaintiff.  *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979).  The verdict of a jury should be sustained if the verdict is supported by "substantial evidence." *Smith*, 451 F.3d at 216.  Evidence is considered substantial when the evidence is adequate and sufficient to support a conclusion of guilt by a reasonable finder of fact. *Id.*

**B.    Discussion**

"Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.  The appellant is convicted of conspiring and attempting to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841.

He was discovered in an apartment where approximately $1,500,000.00 in cash, numerous cell phones and two firearms were found. (J.A. 536.)  No cocaine was discovered at this address and the word cocaine was not mentioned by any of the parties to the appellant who were present at the apartment prior to the search warrant being executed.  The confidential informants, Jose Urias and his brother in law Dante only spoke Spanish which was interpreted through Pedro Sanchez for the benefit of Deon Williams. (J.A. 60, 61.)    All of the negotiations were conducted by Dion Williams outside of the presence of Vincent Williams prior to meeting at Torrey Von Zenon's apartment. (4658 Riverstone Drive, Apt. 201, Owings Mill, Maryland)  According to the transcript, the word cocaine was not spoken during the period of time that the confidential informants were present and taping the conversation of those who were present prior to the execution of the search warrant. (J.A. 33-456)

The government's evidence showed only that the appellant was present and possibly carried a firearm from the couch where he was laying when the search warrant was executed, to the back bedroom. (J.A. 262)  There is no time when the intended use for the money was discussed between Deon Williams, Jose Urias or any others in the presence of Vincent Williams.  Hence the government has not met the burden of proving beyond a reasonable doubt that the appellant knew what the money was for.

"....., it shall be unlawful for any person knowingly or intentionally ----

(1)    To manufacture, distribute, or dispense, or possess with intent to distribute or dispense, a controlled substance,....." 21 U.S.C. § 841(a)(1).  Hence it is apparent that the appellant can only be convicted if he knew that the money he was counting was being used for the purchase of cocaine.   Certainly, the circumstantial evidence that surrounded this case lends itself to an inference that the money was being used for an illegal purpose (the guns, the cell phones and the money itself) but an illegal purpose does not suggest that he knew the money was for cocaine which was the basis for his conviction.   There are numerous other illegal activities that Dion Williams could have been involved with that could explain the intended use for the $1,500,000.00, such as buying illegal cigarettes or illegal weapons.  The record is silent as to what the money was intended for as far as the appellant is concerned.   The jury could not analyze the type of illegal

activities the money was associated with because the jury was never presented with evidence of a <u>cocaine</u> (emphasis added) conspiracy that he knowingly or intentionally became a part of.

*Jackson* states that an appellate court must determine whether the record evidence could support a finding of guilt beyond a reasonable doubt in a light most favorable to the plaintiff. *Jackson*, supra at 318-319. In the instant case the United States has failed to prove that the appellant knowingly or intentionally was counting money for cocaine.

## ARGUMENT
## (Appellant Zenon)

The defendant was denied effective assistance of counsel at a critical stage as mandated by the Sixth Amendment of the Constitution of the United States. As such he should have been permitted to withdraw his plea of guilty and proceed with new counsel.

### A.    Standard of Review

An appellate court reviews *de novo* a district court's denial of a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *United States v. Green*, 599 F.3d 360, 367 (4th Cir. 2010), citing *United States v. Ryan -Webster*, 353 F.3d 353, 359 (4th Cir. 2003). This court has held that, "In determining whether the evidence was sufficient to support a conviction, a reviewing court must determine whether 'any rational trier of fact

24

could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Green*, 599 F.3d at 367, citing *United States v. Madrigal-Valdez*, 561 F.3d 370, 374 (4th Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)).

### B.    Argument

#### 1.    Conspiracy and Overt Acts

This court has held that, "To obtain a conviction for a drug conspiracy, the Government must prove the following essential elements: (1) an agreement between two or more persons to engage in conduct that violates a federal drug law; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy." *United States v. Green*, 599 F.3d at 367; citing *United States v. Wilson*, 135 F.3d 291, 306 (4th Cir. 1998). This court has further held that, "Once the Government has proved a conspiracy, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Green*, 599 F.3d at 367; citing *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992).

There is no dispute that a drug conspiracy existed between Dion Williams, a.k.a., Scroll or Squirrel, and his son and codefendant, Vincent Williams. A large sum of money was to be exchanged for a large sum of drugs from California to Richmond to Maryland. However, there is no significant evidence that Mr. Zenon

participated in this conspiracy or knew of its existence. Mr. Zenon's existence was not known to the DEA, the Alvarezes, Pedro Sanchez, or the confidential sources when this was being arranged. Mr. Zenon was never identified as being in the apartment, restaurant, or hotel at any time by Jose, Pedro Sanchez, or the other confidential source when details of the conspiracy were being discussed or when money was being counted.

Obviously Mr. Zenon did not make any incriminating statements with regards to the conspiracy. Furthermore, no codefendant nor anyone else involved in the conspiracy testified against Mr. Zenon as happens quite often in other cases. There were no writing or recordings of Mr. Zenon engaging in this conspiracy. The government will argue that the cell phones and text messages tie Mr. Zenon into the conspiracy. However, this argument is misplaced. Fifteen cell phone were found in the apartment. Some were locked and some were unlocked. Four were forensically analyzed. There was nothing to tie Mr. Zenon in with a particular phone that was the subject of text messages presented by the government. The very nature of the cell phones, the "phones in a box" make them almost completely untraceable to a particular person as there is no identifiable information attached to a particular cell phone such as a subscriber name as in ordinary cell phones.

2. **Mere Presence**

Appellate courts have addressed the issue of when a defendant's is mere present or can be viewed as being part of a conspiracy. In *United States v. Burgos*, this court cited authority which stated, ". . . that while mere presence alone is insufficient to support a conspiracy conviction, presence with an act that advances the conspiracy suffices to sustain conviction." *United States v. Burgos*, 94 F.3d 849, 869 (4th Cir. 1996); citing *United States v. Saadeh*, 61 F3d 510, 525 (7th Cir.).

There is no dispute that Mr. Zenon was present in the apartment in which a large sum of money, weapons, and other indicia of the drug trade were found. There is also no doubt that Mr. Zenon's name was on the lease, he had an income from Wellco Tank Truck, Inc., and he made a sizeable purchase at Neiman Marcus on Christmas Eve, 2011. These facts do not mean that he was a participant in the conspiracy. No evidence was produced that either Williams had been living there for any period of time. It is unknown how long the Williams had been at the apartment. They could have been there for months, day, or hours. The jury was left to speculate on this subject. No indicia of the drug trade were found in Mr. Zenon's bedroom. In his bedroom was his wallet, clothing, and a laptop computer. The other items and contraband were found in the other bedroom. There was no evidence that this bedroom was associate with Mr. Zenon. The facts do show that

Mr. Zenon had returned to the garage around 6:30 p.m. wearing a reflective vest and white hard hat. It was obvious he had just gotten off from work at Wellco. The agents made a point of stating that they saw his with a black plastic bag in the garage. There was no evidence of any items in the bag, of the bag taking a given form due to the weight of the contents, and if such form would have been square which would be consistent with stacks of cash.

The government has argued that Mr. Zenon was engaged in counter surveillance as identified by Agent Tooley and Alznauer. They claimed he was at the gate looking around and staring at them several times between 10 to 30 seconds, then he walked away and was apparently on a cell phone. The government sought to have Agent Alznauer qualified as an expert in drug investigations and counter surveillance based upon his training, experience, and mostly his education. Alznauer gave expert testimony on the need for drug dealers to engage in counter surveillance to protect themselves from being robbed or arrested. However, the government then effectively ceased this line of questioning. There should have been a discussion of the means and methods of counter surveillance by Agent Alznauer. Agent Alznauer then would have focused in on Mr. Zenon's actions of "looking around and at them" by the gate. Agent Alznauer should have then testified that the defendant's actions, in his opinion, were consistent with someone engaging in counter surveillance. However, as the

28

court is aware, this expert testimony was never produced. Regrettably the District Court relied upon the discussion of counter surveillance as *evidence* that the defendant was actually engaged in counter surveillance. This was improper. The agents discussed among themselves at the scene that they thought they were being counter surveilled. That discussion between the agents in their car and over the radio is not the same as producing admissible evidence that they were actually being counter surveilled by the defendant.

As such, we have a defendant who was seen at the gate looking around and at the agents in the car for between 10-30 seconds. However, there is no evidence that the defendant actually knew who or what he was observing. There was no evidence that the defendant, upon looking at the agents in their car, made a sudden or odd furtive movement consistent with some type of distress. He simply walked away from the gate.

We have a defendant, Mr. Zenon, who was found in his apartment with Dion and Vincent Williams, both of whom were clearly involved in a drug conspiracy. No contraband or any indicia of the drug trade were found in the defendant's bedroom. Nothing ties him to the cell phones which were examined. Nothing ties him to any confidential source. No expert testimony was produced that the defendant, by "looking around and at the agent's car", was engaged in actions which were consistent with counter surveillance. No incriminating statements

were given by the defendant or anyone about the defendant engaged in the conspiracy.   The most the government has against the defendant is the codefendants and items were found in his apartment in which he was merely present.   Since he was merely present as the other codefendants engaged in the conspiracy, it necessarily follows that he did not aid or abet anyone in an attempt to obtain cocaine.   As such, his mere presence, as a matter of law, is insufficient to convict him of either count.

## CONCLUSION
### (Appellant Williams)

For all of these reasons, Appellant respectfully requests that this Court reverse his convictions and sentence for conspiring or attempting to possess cocaine with the intent to distribute it in violation of 21 U.S.C. § 846 and vacate his convictions and sentences.

## CONCLUSION
### (Appellant Zenon)

The appellant prays that this Honorable Court will grant his appeal and reverse his convictions on both counts on the aforementioned grounds.

## REQUEST FOR ORAL ARGUMENT

Counsel hereby request oral argument.

Respectfully submitted this <u>27th</u> day of September, 2013.

Respectfully submitted,

*/s/* John F. McGarvey

John F. McGarvey

JOHN F. MCGARVEY. ATTORNEY AT LAW

10132 W. Broad Street

Glen Allen, Virginia 23060

804.270.4444

*Counsel for Appellant Williams*

/s/ Steven P. Hanna

Steven P. Hanna

ATTORNEY AT LAW

The 21 Professional Center

2025 East Main Street, Suite 116

Richmond, Virginia 23223

804.643.3979

*Counsel for Appellant Zenon*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*7,249*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>September 27, 2013</u>          <u>/s/ John F. McGarvey          </u>
                                          *Counsel for Appellant Williams*

                                          <u>/s/ Steven P. Hanna          </u>
                                          *Counsel for Appellant Zenon*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 27th day of September, 2013, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Peter S. Duffey
OFFICE OF THE U.S. ATTORNEY
600 E. Main Street, Suite 1800
Richmond, Virginia 23219
(804) 819-5473

*Counsel for Appellee*

I further certify that on this 27th day of September, 2013, I caused the required copies of the Brief of Appellants and Joint Appendix to be hand filed with the Clerk of the Court and a copy of the Sealed Volume of the Joint Appendix to be served, via UPS Ground Transportation, upon counsel for the Appellee, at the above address.

/s/ John F. McGarvey
*Counsel for Appellant Williams*

/s/ Steven P. Hanna
*Counsel for Appellant Zenon*